## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SAMUEL CRAIG, as Personal Representative of the Estate of Rosco Craig, deceased, <br><br> Plaintiff, <br><br> v. <br><br> (1) CORECIVIC, INC., a foreign for-profit business corporation, (2) CASE MANAGER DOE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 6:21-cv-183-JAR |

### OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment [Doc. 69] of defendant CoreCivic, Inc. ("CoreCivic").

Plaintiff Samuel Craig ("Dr. Craig"), as Personal Representative of the Estate of Rosco Craig, deceased, brings the following claims under 42 U.S.C. § 1983 for alleged constitutional violations during the decedent's incarceration at Davis Correctional Facility ("DCF"): (1) failure to ensure inmate safety against all defendants, in violation of the Eighth Amendment; and (2) *Monell* liability against CoreCivic.[1] CoreCivic seeks summary judgment on the following grounds: (1) as the private owner and operator of DCF, CoreCivic did not fail to protect the decedent because the conditions of his confinement were constitutionally satisfied; and (2) with respect to the *Monell* liability claim, Dr. Craig has failed to establish any violation of the decedent's constitutional rights by DCF staff.

---

[1] In his response opposing summary judgment, Dr. Craig expressly abandoned his Eighth Amendment claim for inadequate medical care against all defendants. *See* [Doc. 82, p. 19 fn.4].

## I.   UNDISPUTED MATERIAL FACTS [2]

The following facts are undisputed for summary judgment purposes. CoreCivic is a for-profit corporation with its principal place of business in Nashville, Tennessee. [Doc. 69-1, p. 1 ¶1]. At all times material, CoreCivic privately owned DCF – a medium-to-maximum security prison located in Holdenville, Oklahoma. [Doc. 69, p. 8]. CoreCivic staffed DCF, managed prison operations, and housed inmates under the custody of the Oklahoma Department of Corrections ("ODOC"). [*Id.*].

### A.   CORECIVIC POLICIES AND CUSTOMS

Pursuant to the contractual relationship between CoreCivic and ODOC, facility operations at DCF were largely governed by ODOC policy and procedure. *See e.g.*, [Doc. 69-2; Doc. 69-22].

### 1.   Inmate Custody Assessment Procedures

Per ODOC's male custody assessment policy, a DCF classification committee was required to conduct "Custody Assessment Procedures" to "update, review, and re-assess an inmate's initial or previous custody assessment" on an annual basis. [Doc. 69-2, p. 2]. While the committee members ultimately had "total[] discretion[]" in deciding custody placements, they were required to complete a "Classification Assessment Scale" form and score inmates based on consideration of a number of factors, including but not limited to: severity of convictions; severity of active disciplinary convictions; participation

---

[2] For clarity and consistency herein, when the court cites to the record, it uses the pagination assigned by CM/ECF.

in prison educational programs; current earned credit class level; and age. [*Id.* pp. 2-10]. Using the corresponding scoring rubric, facility staff determined an assessed security level – that is, whether the inmate would be placed in minimum, medium, or maximum security. [*Id.* p. 10].

### 2.   Inmate Housing Assignment Procedures

Designated DCF staff members were also required to make housing assignments "on the basis of rational and objective criteria" by "taking into consideration each individual inmate's safety, security, and treatment needs."[3] [Doc. 69-22, p. 2]. Facility staff was obligated to consider the following factors when making housing determinations: escape history; conviction offense; gang affiliation; compatibility with inmate population; history of institutional adjustment; institutional misconduct; custody level; medical and/or mental health needs; subjective safety and security needs; information gathered from inmates in the "Cell Assessment Form" and "Activity/Housing Summary" – *i.e.,* sexual orientation and educational background; and information provided by inmates in the "Self-Report Form" – *i.e.,* mental/development disabilities, gender orientation, sexual victimization, and inmate perception of other vulnerabilities. [*Id.* pp. 2-4]. Using the corresponding scoring rubric, DCF staff assigned inmates with either an "unrestricted" or "restricted" housing status. [*Id.* p. 4].

If an inmate met the "restricted" criteria in a Cell Assessment form, he would receive a special housing assignment. [*Id.* p. 5]. If an inmate met the

---

[3] Unlike the discretion afforded in reaching custody assessments, facility personnel were required to make housing assignment decisions in strict accordance with ODOC's housing policy. [Doc. 69-22, p. 3, ¶I(B)(3)].

3

"unrestricted" criteria, he would be assigned to the first available bunk in a multi-inmate cell within the appropriate security level. [*Id.* p. 4]. Upon assigning a new inmate to a multi-inmate cell, a "Unit Classification Committee" was required to complete a "New Arrival Packet," otherwise known as an "Adjustment Review," and make any necessary changes to the inmate's Cell Assessment form. [*Id.* p. 5, ¶III(C)(2)]. Once the committee confirmed an appropriate assignment was made, a designated staff member was required to sign and date the inmate's Cell Assessment form. [*Id.* p. 6, ¶III(C)(3)]. ODOC's housing policy further provides:

> The "Cell Assessment Form" will be utilized to determine if it is necessary to place an inmate in a single cell based on behavioral/security related issues, the need for administrative segregation and/or protective measures consideration.
>
> Such inmates include but are not limited to the following: . . . (3) Sexual predators; (4) Inmates who are identified as likely to be exploited or victimized by others; and (5) Inmates who have committed violence against other inmates or staff.
>
> If it is possible to provide a single cell, then the process outlined on the assessment form will be followed . . .

[*Id.* p. 7, ¶III(C)(4)(d)].

As a matter of its contractual agreement with ODOC, CoreCivic could not provide qualified inmates with single cell housing at DCF. [Doc. 82, p. 13, ¶25; Doc. 87, p. 10, ¶25]. Chief of Unit Management Julia Dorman testified that she does not recall transferring any inmates to facilities capable of providing single cell housing [Doc. 82-7, pp. 8-9 (114:1-115:15)] since she began working at DCF in or around 2017. [Doc. 69-1, ¶2].

4

### 3.  Inmate Complaint Process and Protective Measures

An administrative grievance process was available for inmates to report any violation of ODOC's housing policy. *See* [Doc. 69-22, p. 2]. Inmates under ODOC custody could also submit a "Request to Staff" or speak with facility personnel to raise any type of issue. [Doc. 69-12, p. 3, ¶7]. If an issue involved safety concerns, inmates could submit a verbal or written request for protective measures which required DCF staff to conduct a "Protective Measures Investigation" ("PMI"), complete a PMI form, and send the form to ODOC to decide whether the requesting inmate qualified for protective custody. [Doc. 82-7, p. 11 (176:11-22)]. Facility staff could also initiate protective measure procedures on their own accord with documented cause. [Doc. 82-8, p. 5 (82:1-11)]. In the event ODOC concluded an inmate qualified for protective custody, DCF lacked capacity to provide the same and qualified inmates would be transferred to another facility. [Doc. 82-7, pp. 11-12 (176:14-177:7)].

### B.  THE DECEDENT'S INCARCERATION AT DCF

On June 22, 2018, an Oklahoma County District Court revoked the suspended sentence of Rosco Craig for failure to register as a sex offender. [Doc. 82, p. 8, ¶1; Doc. 87, p. 7, ¶1]. Craig self-reported as bisexual with no fear of sexual victimization by fellow inmates. [Doc. 69-4, p. 3; Doc. 82-14, p. 1]. After completing an Initial Custody Assessment form [Doc. 69-3] and Cell Assessment form [Doc. 69-4], ODOC classified Craig as a medium security inmate with unrestricted housing status. [Doc. 69, p. 9, ¶¶3-4; Doc. 82, p. 6 ¶2-4].

ODOC transferred Craig to DCF on August 7, 2018. [Doc. 69, p. 8, ¶1; Doc. 82, p. 6, ¶1]. Craig self-reported as a perceived gay or bisexual man who felt vulnerable and/or at risk for sexual victimization. [Doc. 69-5, p. 2]. DCF staff classified Craig as a "potential predator"[4] based on his answers in the Self-Report form [*Id.* p. 5] and chose to rely upon the housing classifications previously made by ODOC rather than complete an Adjustment Review or Cell Assessment form for Craig upon his arrival. [Doc. 82, p. 8, ¶3; Doc. 87, p. 7, ¶3]. As noted by Case Manager Nikki Gibson on August 30, 2018, an Adjustment Review was being completed for Craig "to correct [this] issue." [Doc. 82-14, p. 2]. An initial Cell Assessment form was not completed until October 5, 2018 [Doc. 69-23],[5] and the record indicates DCF staff completed only one Adjustment Review for Craig in June 2019. [Doc. 82-11, pp. 1-2].

On December 10, 2018, Craig submitted a Request to Staff seeking to be housed with inmate Corey Huntley because Craig felt unsafe with his allotted cellmate, Chris Nolan.[6] [Doc. 82-1, p. 3]. Craig further alleged that his facility case manager had placed false information in his inmate file. [*Id.*]. Chief Dorman denied this Request and failed to address Craig's allegations concerning his case

---

[4] Craig subsequently requested to be reclassified as a "potential victim" because, as a convicted sex offender, he felt vulnerable in his unit containing like-classified inmates. [Doc. 82-1, p. 8 ("I was assaulted in county by inmates because of my allegations [of which] expose me to an unreasonable risk of harm.")]. Finding "no reason to change any documents," Chief Dorman denied Craig's reclassification request. [*Id.* p. 7].

[5] This cell assessment was conducted by Ms. Gibson, of whom assigned Craig an unrestricted status with no special housing needs. [Doc. 69-23; Doc. 82-7, p. 16 (213:6-25)].

[6] Craig claimed that, once Nolan discovered his sex offender status, he began "trying to make [Craig] do sexual favors" in an increasingly aggressive manner. [Doc. 87-6, p. 3].

manager. [*Id.* ("You are housed, according to all [O]DOC policies, where you should")].

On December 20, 2018, Craig submitted another Request to Staff seeking a facility transfer based on the following allegations:

> [Get] me away from this facility[.] I'm not safe here[.] My life is in danger[.] . . . If I stay on the yard, I will get killed because of my case[.] . . . I've already been fearing my life is in danger because my case was exposed by Ms. Gibson[.] . . . I'm in fear for my life and need to be moved please.

[Doc. 82-1, p. 4]. According to Chief of Security Kevin Brown, this Request was insufficient under applicable policy to warrant approval. [Doc. 82, p. 9, ¶8; Doc. 87, p. 8, ¶8]. Craig nevertheless submitted an Inmate Grievance on January 7, 2019, seeking a facility transfer based on allegations that he had been sexually harassed by Ms. Gibson and when he "refused her advances she started yelling [to other] inmates" about his criminal charges to get him "hurt." [Doc. 82-20]. He further alleged that Ms. Gibson put false information in his inmate file to get him "killed." [*Id.*]. This Grievance was denied on procedural grounds. [Doc. 82, p. 9, ¶10; Doc. 87, p. 8, ¶10]. There is no evidence that a PMI was conducted on the allegations set forth in Craig's December 20 Request or January 7 Grievance.

In late-February 2019, DCF's Warden affirmed an internal referral recommending that Craig be transferred from general population to an intensive supervision unit ("ISU").[7] [Doc. 69, p. 9, ¶7; Doc. 82, p. 6, ¶7]. Accordingly, on March 18, 2019, Craig was placed with inmate Shawn Farley in cell 213 on an

---

[7] An ISU is a "phase unit" which is essentially a "step-down program from segregation." [Doc. 82, p. 10, ¶11; Doc. 87, p. 8, ¶11]. Craig was recommended for an ISU placement because he had taken property belonging to another inmate. [Doc. 69-1, p. 3, ¶8].

ISU known as "Fox Delta" or "FD." [Doc. 82, p. 10, ¶11; Doc. 87, p. 8, ¶11]. Farley had been convicted of nonviolent crimes, including computer crimes and possession of a weapon. [*Id.*]. Nonetheless, on May 13, 2019 at approximately 5:12 a.m., Craig was found "hog tied" in cell FD 213. [Doc. 82, p. 10, ¶12; Doc. 87, p. 8, ¶12]. According to the Correctional Officer who found Craig, "Farley had taken a torn sheet and tied inmate Craig's hands and feet behind his back and placed him under the lower bunk in the cell." [Doc. 82-3, p. 1]. Farley received a misconduct write-up for assault without serious injury, as Craig sustained abrasions on the back of his head and left wrist. [Doc. 87-8, p. 3; Doc. 82-24]. DCF staff chose not to conduct a PMI into Farley's assault.[8] [Doc. 69-26, p. 3, ¶7; Doc. 82-8, pp. 6-7 (83:23-84:14)]. After receiving medical care for his injuries, Craig awaited housing reassignment in a segregated holding cell. [Doc. 87-9].

A few hours later, Craig was placed back in cell FD 213 with inmate Trevohn Price. [Doc. 82, p. 10, ¶14; Doc. 87, p. 8, ¶14]. Price had numerous violent crime convictions including burglary, sexual battery, rape, and forcible oral sodomy. [Doc. 82-25, p. 1; Doc. 82-26, p. 1]. By the time they were assigned as cellmates, Price had accumulated thirty-two misconduct write-ups over a three-year span – five of which were for assaultive behavior[9] – while Craig had

---

[8] According to a CoreCivic Rule 30(b)(6) witness, no PMI was initiated because DCF staff did not believe Craig's injuries were consistent with his "statement" regarding the assault. [Doc. 82-8, pp. 5-8 (82:20-86:18) ("How are you going to be hog-tied and only get one hand hurt?")]. Ms. Gibson was purportedly responsible for reviewing the Incident Report on Farley's assault [*Id.* p. 9 (87:12-16)] and the decision to forgo protective measure procedures was ultimately made by Chief Dorman. [*Id.* p. 9 (87:6-11)].

[9] *See* [Doc. 82-5, pp. 8-9 (262:13-263:4); Doc. 69-11; Doc. 82-25; Doc. 82-27]. Price's history of violence included: assault on a juvenile affairs officer [Doc. 82-26, p. 1]; assault on a fellow inmate in February 2016, whereby Price inflicted a "severe" head injury [Doc. 82-25, p. 4]; three physical altercations with fellow inmates in March, April, and June 2016 [*Id.*]; and assault on a

accrued seven misconduct write-ups for nonviolent infractions over an eight-month span. [Doc. 82, p. 8, ¶6; Doc. 87, p. 7, ¶6]. A Cell Assessment form was completed for Price on May 19, 2019, assigning him an unrestricted housing status based on the following determinations: (i) Price had an active or prior violent offense; (ii) his past misconduct reflected *no pattern of violence*; and (iii) Price had *no history of violence towards cellmates.* [Doc. 82-28]. A Cell Assessment form was not completed for Craig because, according to CoreCivic, ODOC policy only required completion of said form upon cell reassignment – not cellmate reassignment.[10] [Doc. 87, p. 9, ¶16 (*citing* Doc. 69-22, ¶IV(A)(2))]. The applicable provision of ODOC's housing policy provides:

> Circumstances which may warrant a review of housing status may include, but not be limited to, the following: . . . [c] An inmate identifies enemies and/or provides documented evidence of the need for protection through an assessment of protective measures need[;] [d] An inmate's health (medical/mental condition) changes for better or worse, and a move is warranted for health reasons[;] . . . [f] Based upon an inmate's risk for victimization or abusiveness, the inmate will be re-assessed as determined by the facility head, not to exceed 30 days, from the date of the last cell assessment.
>
> *** Any changes in an inmate's housing assignment status because of the above circumstances will be documented by completing a new 'Cell Assessment Form' []. This information will remain in section 3 of the inmate's field file throughout their incarceration.

[Doc. 69-22, p. 8, ¶IV(A)(1)-(2)].

---

cellmate in March 2018, whereby Price inflicted "minor" injuries. [*Id.*]. In addition, Price was previously disciplined for refusing to house with an inmate whom he perceived was gay. [*Id.* p. 4 ("I'm not going to live with a faget [sic].")].

[10] Craig underwent at least six cell reassignments during his incarceration at DCF. [Doc. 82-15]. According to the record, DCF staff completed a total of two Cell Assessment forms for Craig. [Doc. 69-23; Doc. 69-24].

Within the first week of rooming with Price, Craig informally requested a single cell assignment upon the first sign of conflict. [Doc. 82-9, p. 5]. According to Price and his mother, Carmen Scott, Price also informally requested a new cellmate soon after being placed with Craig.[11] [Doc. 82-5, pp. 28-29 (438:11-439:22); Doc. 82-6, p. 5 (46:7-15)]. Correctional Counselor Heather Runyan purportedly denied the request and told Price there had to be a "physical altercation" for him to be moved. [*Id.* pp. 28-29 (438:24-439:22); Doc. 82-6, pp. 5-6 (46:16-47:20)]. Ms. Runyan does not recall receiving or discussing this housing request with Price. [Doc. 87-11, pp. 5-6 (372:11-373:15)]. Notably, on June 17, 2019, Ms. Runyan filed an Offense Report against Craig for "refusing to return to general population from the phase unit." [Doc. 69-7, p. 20]. An Adjustment Review was completed for Craig on the following day, of which documented his worsening behavior towards DCF staff and inmates, poor personal hygiene, and unkempt living area. [Doc. 82-11, pp. 1-2]. There is no evidence that any remedial measures were taken to address this seemingly sudden decline in Craig's mental condition.

In the early morning hours of June 24, 2019, inmate Charles Snail heard a "ruckus" and "thumping" emanating from a nearby Fox Delta cell. [Doc. 82, p. 12, ¶18; Doc. 87, p. 9, ¶18]. This event occurred while it was "still dark before breakfast time." [Doc. 82-5, p. 21 (394:9-17)]. Snail then heard someone "begging

---

[11] Ms. Scott recalls Price stating that because Craig behaved strangely at night – *i.e.,* he crawled and turned cartwheels around the cell while yelling – Price "felt like he would . . . end up . . . hitting him in the face." [Doc. 82-6, p. 4 (43:8-25)]. While Craig had informed DCF staff in December 2018 that he was hearing voices and hallucinating at night [Doc. 87-15, p. 2], he denied experiencing these symptoms at all subsequent medical checkups. [Doc. 69-18, pp. 4-7].

for his life" for around "three or four minutes." [*Id.* pp. 22-23 (396:24-397:24)]. DCF staff did not respond for a "couple of hours." [*Id.* pp. 25-26 (399:8-400:2)]. According to Case Manager Shana Taylor, staff members responsible for monitoring the FD unit should have responded immediately:

> The inmates in the ISU program on Fox Delta were regularly monitored by staff. Throughout each 24-hour period the posted security staff members made rounds through the housing unit and by each cell, the . . . Shift Supervisor made rounds, the Corrections Counselor and Case Manager made rounds, the Unit Manager made rounds, the medical staff made rounds, and the facility leadership made rounds.

[Doc. 69-13, pp. 3-4, ¶7].

At 6:00 a.m. on June 24, 2019, Ms. Runyan relieved Correctional Officer Joseph Wimberly of his overnight monitoring duties on the FD unit. [Doc. 87-14, pp. 2-4]. She spoke with Price through his cell door at around 7:00 a.m. regarding his desire to make a phone call and noticed that Craig was "in bed and under the covers" [Doc. 69-12, ¶11] with "his head covered with a towel." [Doc. 82-29, p. 1]. During this conversation, Ramie Mires distributed morning medication to Price and "saw nothing" inside cell FD 213 "that suggested a fight" had occurred. [Doc. 69-19, ¶10].

At about 8:20 a.m., an Assistant Shift Supervisor began making rounds and initialed each log sheet posted next to each FD cell door. [Doc. 69-12, ¶13]. At approximately 8:56 a.m., Ms. Runyan again approached cell FD 213 to remove the telephone cart and close the food port. [*Id.* ¶14]. She noticed Craig was still covered up on the bottom bunk and knocked on the cell door in an unsuccessful attempt to gain his attention. [*Id.*]. Price announced that Craig was still sleeping,

but Ms. Runyan saw a "small blood smear" on an exposed part of Craig's bed sheet and immediately radioed for emergency response teams. [*Id.*].[12]

At approximately 9:00 a.m., medical and emergency response teams arrived on the Fox Delta unit. [Doc. 82, p. 12, ¶20; Doc. 87, p. 10, ¶20]. Price was escorted to a holding enclosure and security staff placed Craig on a gurney while medical personnel began performing CPR [Doc. 82-30, p. 1], as Craig was "unresponsive, cold, with no respirations" or "pulse" [Doc. 69-20, p. 3, ¶3; Doc. 69-21, p. 2]. At around 9:20 a.m., EMS arrived and administered CPR for another twenty minutes before rushing Craig to Holdenville General Hospital. [Doc. 82-30, p. 1]. Craig was pronounced dead at approximately 10:06 a.m. on June 24, 2019. [*Id.*]. It was ultimately determined that Craig died by homicide through blunt-force trauma to the head.[13] [Doc. 82, pp. 12-13, ¶21; Doc. 87, p. 10, ¶20].

CoreCivic conducted an internal investigation into Craig's death and found that, among other things, there was a "delayed response time" by DCF staff members responsible for supervising the FD unit on June 24, 2019. [Doc. 82-30, p. 3]. ODOC also investigated the circumstances surrounding Craig's death and reported, among other things, that: (i) Price had placed a towel over Craig to conceal his "bloodied face and head"; (ii) two "wet towels covered in blood," a "pair of blood-stained pants," and one "blood-soaked sock" were found within cell FD 213; and (iii) the scene appeared to have been altered, "as blood stains

---

[12] According to Ms. Mires, however, "[t]he bed covers over Rosco Craig were not soiled or bloody." [Doc. 69-19, p. 4, ¶10].

[13] On November 1, 2022, Price was convicted of first-degree manslaughter in causing the death of Craig. [Doc. 82, p. 13, ¶22; Doc. 87, p. 10, ¶22].

were evident throughout cell 213 as if someone had attempted to clean the cell."
[Doc. 82-29, p. 2].

Dr. Craig initiated this § 1983 suit on June 24, 2021, and his remaining
causes of action include an Eighth Amendment claim for failure to ensure inmate
safety against all defendants and a claim for *Monell* liability against CoreCivic.

## II.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." A fact is
"material" if it "might affect the outcome of the suit under the governing law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine"
if "the evidence is such that a reasonable jury could return a verdict for the
nonmoving party." Id. "Factual disputes that are irrelevant or unnecessary will
not be counted." Id. Further, the nonmoving party "must do more than simply
show that there is some metaphysical doubt as to the material facts." Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

However, "at the summary judgment stage the judge's function is not
himself to weigh the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.
A court must examine the factual record in light most favorable to the party
opposing summary judgment. Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793,
796 (10th Cir. 1995). Summary judgment is appropriate only "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (*quoting* Fed. R. Civ. P. 56(c)).

## III. ANALYSIS

Before a substantive analysis of Dr. Craig's claims, the court must first determine whether CoreCivic is a proper defendant under § 1983. The statute provides that "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) "that the alleged violation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

In addition to suing the individual(s) directly responsible for the constitutional violation alleged, Dr. Craig has sued the private company that employs and pays such individual(s). When "private individuals or groups" like CoreCivic "are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Evans v. Newton, 382 U.S. 296, 299 (1966). As a state grantee "acting for the government out of a government program in accordance with government regulations," CoreCivic does not challenge its status as a person acting under color of state law. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 n.13 (10th Cir. 2003) (holding private party acting in accordance with

duties imposed by government contract, when sued solely on basis of those acts dictated by government, is implicitly subject to liability).

Under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) and its progeny, municipal liability requires Dr. Craig to first demonstrate that the decedent suffered some violation of rights protected by the constitution. Id. at 690. If such violation exists, Dr. Craig must then prove the violation was the direct result of a custom or policy maintained by CoreCivic. Id. at 694.

### A. ALLEGED CONSTITUTIONAL VIOLATION

The Eighth Amendment's Cruel and Unusual Punishment Clause imposes a duty on prison officials to "provide humane conditions of confinement," including "taking reasonable measures to guarantee the safety of inmates." Hooks v. Atoki, 983 F.3d 1193, 1205 (10th Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)). This overarching obligation includes a duty "to protect prisoners from violence at the hands of other prisoners." Id. (quoting Farmer, 511 U.S. at 833). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. Rather, a prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must objectively be "sufficiently serious," and (2) the defendant's state of mind must subjectively have been one of "deliberate indifference" to inmate safety. Id.; Smith v. Cummings, 445 F.3d 1254, 1259 (10th Cir. 2006) ("Mere negligence does not constitute deliberate indifference; deliberate indifference is equivalent to recklessness in this context.").

To satisfy the objective component, Dr. Craig must show CoreCivic set in motion a series of events that it knew or reasonably should have known would cause others to deprive the decedent of his constitutional rights. *See* <u>Schneider v. City of Junction Police Dep't</u>, 717 F.3d 760, 768 (10th Cir. 2013). The undisputed harm suffered by Craig – death by inmate-on-inmate assault – is itself sufficient to satisfy the objective prong. *See* <u>Mata v. Saiz</u>, 427 F.3d 745, 753 (10th Cir. 2005) (explaining the objective component is met when the harm suffered rises to sufficiently serious levels and is significant, not trivial, suffering); *see also* <u>Wilson v. Seiter</u>, 501 U.S. 294, 296 (1991) (noting the objective test inquiry is simply: "Was the deprivation sufficiently serious.").

To meet the subjective component, Dr. Craig must show DCF staff was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that certain DCF staff members actually "[drew] the inference." <u>Riddle v. Mondragon</u>, 83 F.3d 1197, 1204 (10th Cir. 1996) (*quoting* <u>Farmer</u>, 511 U.S. at 834). "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." <u>Farmer</u>, 511 U.S. at 842. In sum, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id</u>. at 847.

16

Dr. Craig makes several arguments with respect to his claim that DCF staff knew or should have known housing Craig with Price presented a substantial risk of serious harm to the decedent. Dr. Craig initially contends that, despite Price's prior infraction for refusing to house with an inmate whom he perceived as homosexual and Craig self-reporting as bisexual and/or a perceived homosexual, DCF staff chose to house the two inmates together in total disregard for Craig's safety. While the record confirms Dr. Craig's contentions, it also indicates that Craig inconsistently self-reported as heterosexual [Doc. 69-6, p. 2; Doc. 69-24, p. 3], and was also disciplined for refusing to house with an inmate whom he perceived was homosexual. [Doc. 69-7, p. 3]. In addition, Dr. Craig draws no connection between the decedent's sexuality and the fatal assault he suffered at the hands of Price.

Nevertheless, Dr. Craig further contends the nature of Craig's underlying conviction generally placed him at a heightened risk of assault. Both the record and common sense suggest that DCF staff had actual knowledge of the risk to Craig's safety with respect to his sex offender status. It is undisputed that facility staff classified Craig as a "potential predator" *because* of his underlying conviction, housed him in a general population unit with like-classified inmates, and then denied Craig's requests to either be reclassified as a "potential victim" or be reassigned to a safer unit or facility. There is no evidence that facility personnel investigated any of the seven Requests to Staff wherein Craig expressed concerns for his safety based on allegations that Ms. Gibson and/or other inmates were exploiting him by way of and/or because of his underlying

17

conviction. [Doc. 82-1, pp. 4-8, 13-16]. In addition, the record suggests that Ms. Gibson was permitted to continue managing certain aspects of Craig's incarceration following his allegations that, with malicious intent, she was informing other inmates of his status as a sex offender. She purportedly played a role in the decision to forgo protective measures for Craig after he was assaulted by Farley. *See* [Doc. 82-8, p. 9 (87:1-16)]. By housing Craig with Price a few hours later, it appears DCF staff (i) disregarded Craig's allegations against Ms. Gibson and repeated requests for greater protections, (ii) overlooked (or ignored) Price's history of violence, and (iii) discounted the safety risks that inherently beset prisoners with sex offender convictions.

In the same vein, Dr. Craig contends that DCF staff clearly demonstrated their indifference towards Craig's safety by housing him with Price – an inmate with a well-documented history of violence.[14] This housing decision was made on the same day that Craig was assaulted by Farley – an inmate convicted of nonviolent crimes with a peaceable prison record. It is reasonable to infer that replacing Farley with Price presented a substantial risk of serious harm to Craig. The repeated failure of DCF staff to conduct PMIs or provide Craig with protective measures is further indicative of such indifference.[15]

---

[14] *See* Farmer, 511 U.S. at 842-43 ("[I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.").

[15] DCF's Warden markedly acknowledged in 2022 that "[PMIs] were not being done properly" by facility staff. [Doc. 82-34, p. 4].

Accordingly, this court finds that the allegations and evidence set forth by Dr. Craig sufficiently show DCF staff had knowledge that a substantial risk of serious harm existed for the decedent and disregarded such risk by repeatedly failing to take reasonable measures to guarantee his safety. CoreCivic is therefore not entitled to summary judgment on Dr. Craig's Eighth Amendment claim for failure to ensure inmate safety.

### B.   LIABILITY OF CORECIVIC UNDER § 1983

The second step in the § 1983 analysis is to determine whether the violation alleged resulted from a policy or custom of CoreCivic. *See* <u>Monell</u>, 436 U.S. at 694. To start, a private defendant such as CoreCivic cannot be held liable under § 1983 based solely on the actions of its employees. *See* <u>id.</u> at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Id.</u> at 694; <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality . . . has caused an employee to [violate the decedent's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

Thus, Dr. Craig must go beyond a respondeat superior theory of liability and establish (1) an official policy or custom of CoreCivic (2) caused a violation of the decedent's federal rights and (3) was enacted or maintained with deliberate indifference to an almost inevitable federal rights violation. <u>Schneider</u>, 717 F.3d

at 770. Put simply, Dr. Craig must show "a direct causal link between the action and the deprivation of federal rights." Brown, 520 U.S. at 404.

Dr. Craig argues that CoreCivic maintained a policy or custom of failing to provide protective measures for inmates, like the decedent, who were at excessive risk of inmate-on-inmate assault. *See* Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs, 962 F.3d 1204, 1239-40 (10th Cir. 2020) (noting that policies or customs meeting the *Monell* standard may arise from "an informal custom that amounts to a widespread practice") (citation omitted); *see also* City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). The record contains evidence supporting this contention, the most prominent example being DCF staff's failure to conduct a PMI or provide Craig with protective measures after he was assaulted by Farley.

Dr. Craig must next demonstrate that CoreCivic's de facto custom caused the alleged Eighth Amendment violation. *See* Schneider, 717 F.3d at 768. To establish causation, Dr. Craig must show, by "rigorous standards," that CoreCivic was the "moving force" behind the injury. Brown, 520 U.S. at 405. Dr. Craig makes several arguments with respect to his claim that, because DCF staff enforced CoreCivic's challenged custom, the decedent suffered fatal injuries. To start, Dr. Craig contends that Craig's death resulted in part from DCF staff's failure to complete paperwork[16] that was required under ODOC's housing policy

---

[16] Based on the record before the court, it also appears CoreCivic had no measures in place to ensure *completed* paperwork was properly maintained by DCF. Chief Dorman testified that, as the head of unit management, she never audited inmate files to ensure compliance with ODOC policy. [Doc. 82-7, p. 4 (29:13-21)]. The Case Manager for inmates housed in the FD unit believed Price and Craig "were a good match for each other" because, among other reasons, "neither were active in a gang." [Doc. 69-13, p. 3, ¶5]. Craig had, however, submitted multiple documents to DCF staff to disclose his affiliation with the 46 Neighborhood Crips. [Doc. 82-1, pp. 1, 12].

20

for the stated purpose of ensuring the safety of inmates. *See* [Doc. 69-22, p. 2]. Per ODOC policy, facility staff was required to conduct an Adjustment Review upon initially assigning Craig to a general population unit. [Doc. 69-22, p. 6, ¶III(C)(2)]. While Ms. Gibson represented in August 2018 that new arrival paperwork was being processed for Craig, the record contains a single Adjustment Review that was completed on June 20, 2019 – four days before Craig was fatally assaulted.[17] [Doc. 82-11]. The Review documented Craig's deteriorating state of mind, but there is no indication that DCF staff implemented any remedial measures to ensure the safety of Craig or his fellow inmates.

Furthermore, despite ODOC policy explicitly requiring facility staff to make "any necessary changes" to an inmate's Cell Assessment form following completion of an Adjustment Review in order "to determine if any special housing needs exist" [Doc. 69-22, p. 5, ¶III(B)], a Cell Assessment form was not completed for Craig following the aforementioned Review.[18] If DCF staff had complied with ODOC's housing policy rather than CoreCivic's custom, Craig arguably would have qualified for single cell housing or some other form of protective custody prior to his death on June 24, 2019. *See* [*Id.* pp. 6-7, ¶III(C)(4)(a)-(d)].

---

[17] According to Chief Dorman, an Adjustment Review should have been completed for Craig upon a "level change[] or every four months." [Doc. 82-7, p. 13 (185:1-3)]. Craig was incarcerated at DCF for a total of ten months, during which time he underwent numerous level changes.

[18] DCF staff completed a total of two Cell Assessment forms for Craig, both of which predated his housing assignment with Price. As noted, CoreCivic argues ODOC policy only required its employees to complete said form upon cell reassignments, rather than cellmate reassignments. Even if taken as true, this proffered policy interpretation does not explain why CoreCivic's employees completed two Cell Assessment forms for Craig, of whom experienced at least six cell reassignments during his incarceration at DCF.

DCF staff did, however, classify Craig as a potential predator *because* of his sex offender status and immediately housed him in a general population unit filled with like-classified inmates. When Craig requested to either be reclassified as a potential victim or be transferred to a different facility based on concerns for his safety, Chief Dorman responded by stating: "[T]here is no reason to change any documents." [Doc. 82-1, p. 7].[19] The record contains at least nine requests from Craig for housing reassignment, facility transfer, or single cell housing – all of which were denied by DCF staff with no indication that any good faith reviews were conducted. *See* [Doc. 69-22, p. 9, ¶V(B) (mandating review of circumstances underlying *all* inmate requests for housing reassignment)]. While CoreCivic argues, in part, that its employees denied these housing requests because Craig lacked evidence to support his claimed safety needs, it is undisputed that no protective measures were provided for Craig following Farley's assault – an inmate-on-inmate attack of which there was ample evidence to substantiate.[20]

Finally, Dr. Craig contends Ms. Runyan informed Price that his request for cellmate reassignment would be denied absent evidence of a physical altercation with Craig. The facts underlying this contention are heavily disputed. While CoreCivic denies that it maintained a custom of refusing housing reassignment

---

[19] *But see* [Doc. 69-22, p. 7, ¶III(C)(4)(e) ("Assignments may be made for inmates who are unrestricted but need specific housing arrangements due to the inmate's vulnerability such as . . . criminal history[.]")].

[20] *See e.g.,* [Doc. 82-2 (Incident Statement by the Correctional Officer that found Craig hog-tied in his cell); Doc. 82-3 (Incident Report, noting that two Correctional Officers wore body cameras at the scene of Farley's assault); Doc. 82-4 (Offense Report against Farley); Doc. 82-24 (Pictures of injuries suffered by Craig at the hands of Farley)].

requests absent evidence of an assault, the company fails to address the fact that both Price and a CoreCivic Rule 30(b)(6) witness testified to the existence of this allegedly fictitious practice. Viewing the evidence in the light most favorable to Dr. Craig and due to the existence of a genuine dispute over material facts, the court finds the issue of causation is a question of fact for the jury. Therefore, CoreCivic is not entitled to summary judgment on Dr. Craig's claim for *Monell* liability.

## IV.  CONCLUSION

WHEREFORE, the Motion for Summary Judgment filed by defendant CoreCivic, Inc. [Doc. 69], is hereby **DENIED**.

IT IS SO ORDERED this 14th day of March, 2024.


_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE

23